## John E. Leonard's Appeal.

1. Where inquiry becomes a duty, the party who neglects to perform it should be visited with at least constructive notice of the facts that probably would have been brought to light if it had been duly made.

2. As a general rule, inquiry of the obligor is sufficient to ascertain whether there is any defence to the payment of a judgment entered on a note, but where the obligor has assigned all his property for the benefit of creditors, and the assignee, by accepting the trusts, has undertaken to pay the creditors, as far, at least, as the assets in his hands will reach, inquiry should be made of him also.

March 25th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, TRUNKEY and STERRETT, JJ. PAXSON and GREEN, JJ., absent.

Appeal from the Court of Common Pleas of *Chester county :* Of July Term 1878, No. 81.

Appeal of John E. Leonard from the decree of the court confirming the report of the auditor in the matter of the petition of Lewis Davis.

The proceedings in the court below and the facts are set forth in the following portions of the report of the auditor :—

"John R. Stapleton and wife, on the 12th of August 1869, executed and delivered to Lewis Davis a deed of voluntary assignment in trust for the benefit of creditors. Lewis Davis accepted the trust, and on the 13th day of August filed his petition for the appointment of appraisers, and on the 9th of September 1869, an inventory of the assigned estate. On the 15th day of November 1870, a second bond (the first one being defective in form), in which Robert Neeley and Alexander Martin were sureties, was filed and approved by the court. On the 20th day of May 1871, the assignee filed an account to which, on the 13th day of June, exceptions were filed by W. B. Maitland, and other exceptions by John R. Stapleton, and on the same day a petition was presented to the court for an auditor to distribute the balance standing on the account. George M. Rupert, Esq., was appointed auditor upon the exceptions, and also to make distribution. The report of the auditor was filed on the 18th day of December 1871, and the same day the court made an order that the assignee pay in accordance with said report. The claims upon the fund were presented to the auditor on the 21st day of October 1871. The claims were handed in by Rees Davis, Esq., who was acting as principal counsel for the assignee, and among them was the following, viz. : " Judgment in favor of John E. Leonard entered November 19th 1868, in judgment docket E, page 453 :—

| | |
|---|---|
| For . . . . . . . . . | $3000.00 |
| Int. from September 9th 1869, to December 1st 1871, | 401.00 |
| Total claim, . . . . . . . | $3401.00 |

" On this claim the auditor awarded to John E. Leonard as follows, viz. :—

| | | | | | | |
|---|---|---|---|---|---|---|
| From personal property, | . | . | . | . | . | $ 299.16 |
| From real estate, . | . | . | . | . | : | 2457.60 |
| | | | | | | |
| Total award, | . | . | . | . | . | $2756.76" |

" On the 19th day of June 1873, an action of debt was brought in the Court of Common Pleas of Chester county, on the official bond of Lewis Davis, assignee of John R. Stapleton, the case being as follows, viz. :—

The Commonwealth of Pennsylvania,　⎫　In the Common Pleas
　　at the suggestion of　　　　　　　 │　　of Chester county,
　　　　JOHN E. LEONARD,　　　　　　　 ⎬　No. 85 to August Term
　　　　　　　v.　　　　　　　　　　　　 │　　　1873.
LEWIS DAVIS, ROBERT NEELY and　　　　 │　Summons Debt.
　　ALEXANDER MARTIN.　　　　　　　　　⎭

" The plaintiff's statement, filed at the time of issuing the præcipe, exhibited a copy of the said bond, and also of the distribution reported by the auditor as above stated, and demanded the said sum of $2756.76, with interest thereon from the 18th day of December 1871. The sheriff returned that he had summoned Lewis Davis personally, and the other two defendants by leaving a copy of the writ at their respective homes on the 27th of June 1873. On the 3d day of July 1873, Lewis Davis filed an affidavit of defence, alleging payment on or about the 10th of April 1871, of the judgment above mentioned, a copy whereof accompanied this report. On the ninth day of August 1873, the plaintiff filed a *narr.*, and on the same day entered a rule to plead. The defendant on the 18th and 29th days of August filed their plea of *nil debet*, whereby the case was put at issue. At this stage of the proceedings, the defendant, Lewis Davis, on the 11th of September 1873, presented his petition to the court asking for relief, by having the report of auditor referred back to him for correction, and the court so referred it for hearing upon the matter alleged in the affidavit.

" Mr. Davis alleges that about the 1st day of April 1871, Mr. Leonard demanded payment of the judgment in question, and took steps to enforce his demand by legal process; that thereupon he raised the money and paid off the debt, and took up the bill single, which represented it; that subsequently he handed this bill single to his attorney, Rees Davis, to be presented to the auditor in Stapleton's estate, under the belief that that was the proper course to be pursued, and that the money awarded thereon belongs rightfully to him, and not to Mr. Leonard. On the other hand, Mr. Leonard alleges that, although about the 1st of April 1871,

[Leonard's Appeal.]

he demanded payment of the judgment, and sought to enforce it, yet that Mr. Davis at first resisted payment, and afterwards entered into an arrangement whereby it was postponed for the time being; that he, Leonard, on or about the 8th day of April 1871, sold and transferred the obligation to Rees Davis, and about the 16th day of June following, repurchased it from him; and that ever since he has been the owner of it, and is justly entitled to the money awarded to him by the auditor as aforesaid. * * *

"We find the following facts: That John E. Leonard, being the holder of the Stapleton note for $3000, gave notice to Lewis Davis, the assignee, through Rees Davis, Esq., his attorney, sometime in March 1871, that he would require payment of the same at the 1st of April following.   That Lewis Davis, in consequence of that demand, on the 27th day of March 1871, sent to Rees Davis the sum of $1549,88, and on the 3d of April, the further sum of $1110, and about the 10th of April, the additional sum of $590.60, an aggregate of $3250.48, which moneys were directed by him, and were received by Rees Davis, to be applied to the payment of the note in question.   That, on the 3d day of April 1871, Mr. Leonard, not having received any moneys in response to his demand for payment, issued a pluries fi. fa. on the judgment entered upon this note. * * *   That on the 5th or 6th of April 1871, Rees Davis paid over to Mr. Leonard, on account of the Stapleton note, a check of $600, and on the 7th of April, in cash, $1000; and on the 8th of April, a check for $800, and in cash, $175.   He also gave to Mr. Leonard, on the 8th of April, his own judgment-note for $75, payable in two days, $25 of which was to be applied towards the payment of the Stapleton note, and the balance was intended to cover the costs of the execution above mentioned.

"He further gave to Mr. Leonard, at the same time, his own judgment-note for either $400 or $500, payable in two months (for which he transferred the Whiteside bond as collateral), making a total of $3000 or $3100, which Mr. Leonard then accepted in full payment, satisfaction and discharge of the Stapleton note, and thereupon delivered the same over to him, which he, on the next day, the 9th of April, carried up to his father and delivered over to him.   On the 10th of April, Rees paid to Mr. Leonard the $25 balance on the Stapleton note and the costs of execution, and took up the $75 note which he had given two days before; that on the 8th of April Mr. Leonard executed a blank assignment of the Stapleton note and judgment, which he delivered over to Rees, along with the note itself, but whether this assignment passed into the hands of Lewis Davis, along with the note, does not satisfactorily appear.   That during the first half of the month of June 1871, Rees Davis got the Stapleton note from his father, upon the pretext that it was necessary he should have it to lay before

the auditor, who had been, or was about to be, appointed to report distribution in the assigned estate of Stapleton.   That Lewis Davis parted with its possession upon this representation and for that purpose, and without any knowledge or understanding on his part, that it was to be used for any other purpose whatever; and he was, in fact, not aware that any other use had been made of it until so informed by Mr. Leonard, in the spring of 1873.   That on the 16th of June 1871, Rees being unprepared to pay off the note which he had given on the 8th of April, at two months, gave in lieu thereof, his note for $500, payable on the 1st day of April 1872, and at the same time he gave Mr. Leonard another note for $1500, also payable on the 1st of April 1872, and received from Mr. Leonard, in consideration thereof, a check for $1120, the difference of $380 being discount on the two notes, at the rate of two per cent. a month, retained for the use of the money.   At the same time, and as a part of the same transaction, papers were made and delivered, and Mr. Davis then passed over to Mr. Leonard the Stapleton note, together with the blank assignment which the latter had executed on the 8th of April previously; but whether the words, 'collateral for Stapleton and Whiteside bonds,' were put on the notes at that time, or not until afterwards, the auditor is unable to determine, as the two witnesses who alone have knowledge on the subject stand diametrically opposed to each other.

" That Lewis Davis was not privy to this transaction of the 16th of June, and did not become fully cognisant of the facts until they were developed in the course of the present investigation. * * * That when the audit for distribution in the Stapleton estate was held in the fall of 1871, the judgment entered on the note in question participated therein, being awarded $299.16 out of the personal property, and $2457.60 out of the proceeds of real estate—the latter sum being the balance of such proceeds, after paying prior liens in full; and it appears that this judgment was presented along with the other claims against the assigned estate by Rees Davis, as attorney for the assignee, and the dividend was awarded to Mr. Leonard, because the judgment stood upon the record in his name.   That Mr. Leonard made no demand upon the assignee for payment of the dividend so awarded to him, until the month of April 1873, at which time Rees Davis had disappeared from West Chester, and his whereabouts were unknown.

" There was a collateral issue raised during the investigation respecting the genuineness of the signatures of a paper purporting to be an acknowledgment of no set-off to the Stapleton note by the assignee.   This paper purports to have been signed by Lewis Davis, as maker, and by Rees Davis as a witness. * * * There is no presumption, legal or otherwise, in favor of the genuineness of these signatures, and the burden is upon Mr. Leonard, who offered them in evidence, to establish their verity.   This, we think, in view of

all the evidence, he has failed to do. It must not be understood, however, that we pronounce them to be forgeries. That is not the issue. We simply find that they have not been proved to be genuine. We might, perhaps, find upon the same evidence that they had not been proved forgeries; but as that is not the issue, we are not called upon to record our opinion."

The auditor then proceeded:

"Now, was the taking up of this obligation a payment or a purchase on the part of Lewis Davis? We have already seen that payment was what Mr. Leonard demanded and sought to enforce; and we have also observed that the money was forwarded by Mr. Davis, accompanied by a stipulation that it was to be used in making payment of the obligation. But it is said this purpose which both parties had in view was not carried into effect, and that a transaction, essentially different in its consequences was substituted in its place. Why should this intention of the parties be so changed? And would it not be a fraud upon Lewis Davis to so act? And could anyone privy to the transaction reap any advantage from it subsequently?

"It is clear, so far as Lewis Davis is concerned, payment was what he intended should be made, and payment was what afterwards had been made. And it is also clear he believed at that time he had enough trust funds in his hands to pay off the obligation in full; and he actually had enough, and more than enough, before taking out his commissions as assignee. There was no motive or inducement to purchase which did not exist also to pay, or was superior in the former to the latter case. The moneys employed to take up the obligation were the trust funds belonging to Stapleton's estate, and we are persuaded Mr. Leonard had knowledge of that fact at the time the transaction was consummated; at least the probabilities are in consonance with this opinion. * * * There was no consideration whatever for this contract for sale, and the delivery of the note in contract for sale, and the delivery of the note in question, and the blank assignment of the judgment, except what, if any, is to be found in the $1120 which Mr. Davis received from Mr. Leonard on the $1500 note. The design and real purpose was that these judgments should be pledged as collateral for the $1500 note; and the words on the note, "collateral for the Stapleton and Whiteside bonds," are a perversion of the truth, the fact being precisely the reverse of the statement therein contained. We are conscious that this finding in the face of the writing itself, may seem strange, but an acquaintance with all the facts makes the conclusion inevitable.

Recurring now to the transaction in April, we are of opinion, from a careful consideration of all the facts and evidence in the case, that it should be regarded as a payment of the obligation, and not as a purchase thereof.. Indeed, it might well be doubted,

[Leonard's Appeal.]

as before intimated, whether the assignee could buy up the obligations of the assignor, and thus put himself in a more hostile attitude towards the estate or its creditor, than he had previously occupied. He certainly could not do so with the trust funds, and it is very questionable whether he could do so with his own funds, unless some equity was to be enforced by reason of the proceedings. * * * Being a payment, the effect was an extinguishment of the debt—an absolute wiping it out of existence. And it was thenceforth incapable of being used for any purpose whatever. It follows, of course, that any attempt thereafter to sell or assign or pledge the security, would be invalid and fruitless. No title can be acquired to a dead security. But it may be contended that whilst payment with the trust funds would at law be an extinguishment of the debt, and the judgment could not afterwards be kept on foot without the consent of persons interested, yet in equity, the judgment would still exist, to enable the payor to indemnify himself in the marshalling of the assets or to obtain an order in his favor in the distribution, and that if he chose to assign or to allow an agent or attorney to assign to another, whatever sum he might be entitled to in distribution, there is no principle of law or equity will interfere to prevent it. * * * But Mr. Leonard could not obtain title through this fraudulent proceeding; even if he were an innocent purchaser for value he would acquire no title. The fraudulent vendor having no title, he could not invest his vendee with any. * * * But we do not think Mr. Leonard is to be regarded in exactly the light of an innocent purchaser for value. There was enough in the case and in the manipulation of this particular security to have put him on inquiry. He was entirely acquainted with the transaction of 1871, and he knew or ought to have known that the bond had been taken up by Lewis Davis with trust funds. Whilst we do not imagine that he was cognisant of the fraud that was being perpetrated, or was lending a willing and knowing assistance thereto, we nevertheless think that he did not exercise that caution and make that inquiry which his knowledge of the circumstances and of the relation of the parties made it incumbent upon him to exercise. In other words, he was in default in accepting this transfer without first endeavoring to ascertain Rees Davis's status in connection with the obligation. This is not to his discredit, but it is unfortunate for his claim." * * *

The auditor then reported that the sum of $2756.76 was improperly paid to Mr. Leonard, in the distribution of the Stapleton estate, and that the said sum should have been awarded to Lewis Davis.

Exceptions were filed to the report of the auditor, which the court dismissed, whence this appeal.

*Wayne MacVeagh* and *Joseph J. Lewis*, for appellant.—The

report of the auditor shows that Rees Davis was the attorney and agent of Lewis Davis, his father, and managed the business of the trust with unlimited authority. He did as he pleased in every respect without being subject to question or inquiry. Being thus the agent of his father, it is necessary to consider what are the consequences of that relation. The rule which applies to principal and agent is thus stated by Mr. Bispham, in his treatise on Equity, sect. 368, p. 334, 2 ed., as deduced from the best authorities. "Notice to an agent is notice to the principal, and it is considered, as far as the principal is concerned, as constructive notice, because the principal and agent as to matters within the scope of the latter's authority, are regarded in the eye of the law as one."

Having allowed Rees Davis for two years to manage this business, in his own way, and to represent himself as the owner of the claim which he put into his hands with the power to transfer it at his option, without supervision or inquiry on his own part, it is certainly not for the appellee to say, now that circumstances have wholly changed, and the fraudulent agent has become a pennyless outcast, that Mr. Leonard ought, before taking a re-transfer of the claim, to have gone beyond the agent and inquired of the principal, personally, whether the appearances which he himself had created, were true, and the powers which he had himself conferred, were about to be abused. It is evident that the negligence imputed by the court to Mr. Leonard, not only does not appear, but that he was fully warranted in treating Rees Davis as the owner of the claim, and that if Lewis Davis was imposed upon by his son and agent, he had his own gross negligence and utterly misplaced confidence to thank for it.

*R. T. Cornwell* and *William Waddell*, for appellee.—When an assignee, for the benefit of creditors, takes an assignment of a judgment against his assignor, it is a payment of the debt and not a purchase of the obligation: Wood *v.* Van Arsdale, 3 Rawle 401; Keller *v.* Leib, 1 P. & W. 220; Hill *v.* Frazier, 10 Harris 320.

The debt being paid, it was utterly gone—wiped out of existence. The assignee, by right of subrogation, would be entitled to the dividend awarded to the judgment lien from the estate; but that would be an equitable right, wholly apart from any ownership in the lien itself. Once gone, the debt could not be restored. No transfer of the worthless obligation which once represented it, could give it new life. Lewis Davis himself could not sell it back to Leonard, much less any one else. If the bond was stolen from the assignee, or obtained by misrepresentation of the purpose for which it was to be used, and fraudulently passed back to the original holder without notice of the fraud, or the merger and extinction of the debt, the latter could take nothing by it from the estate. He could only look for damages to the man who perpetrated the fraud.

Mr. Justice STERRETT delivered the opinion of the court, May 3d 1880.

The learned auditor, after careful consideration of the testimony, found that the transaction in April 1871, between the appellant and Rees Davis, as attorney for the assignee, was in reality a payment of the judgment. While this finding of fact was not reversed by the court, it was considered somewhat doubtful and open to controversy whether the transaction was understood by the parties to be a payment or a purchase. We have no means of satisfactorily solving the doubt except by what appears upon the face of the report itself. The testimony on which the auditor based his conclusions is not before us. It is a safe rule, and one that should be adhered to, that the facts found by an auditor should be accepted as true until the contrary is clearly shown; and we are unable to say that this has been done in the present case. If the transaction was in fact a payment, as the auditor found, the appellant has no reason to complain. But, assuming the auditor was mistaken, and instead of being a payment, it was, as appellant contends, a purchase of the judgment, how would the case stand? If the appellant received the full amount of his judgment in cash and a note of $400, as the auditor finds, and surrendered the original judgment-note with an assignment of the judgment in blank, he of course ceased to have any interest in the claim. It belonged exclusively to his assignee, who was then in a position to accept payment from or make terms with the obligor or any one on whom the duty of discharging the obligation devolved. The matter stood in this condition for over two months, when the appellant negotiated for a re-assignment of the note and judgment to himself. In taking the re-assignment he claimed that he had procured a certificate of no defence from the appellee, Lewis Davis, but the genuineness of that paper was disputed, and the auditor found that it was not established. In approving this finding, the court says: " We agree with the auditor that an unbiassed view of all the testimony fails to satisfy the mind that Lewis Davis signed the paper intentionally or otherwise." The certificate of no defence being thus properly out of the case, there was not a particle of testimony to show that any effort was made by appellant, or any one on his behalf, to ascertain from either the obligor or the trustee of his assigned estate whether there was any defence to the payment of the judgment. It cannot be doubted that it was his duty to make such inquiry: Eldred v. Hazlett, 9 Casey 307; Ashton's Appeal, 23 P. F. Smith 153. As a general rule, inquiry of the obligor is sufficient; but where, as in this case, he has assigned all his property for the benefit of his creditors, and the assignee, by accepting the trust, has undertaken to pay them, as far at least as the assets in his hands will reach, inquiry should be made of him also. The reason of this is so obvious that a bare statement

of the proposition is sufficient. He has not only the right, but it is his duty, to discharge the obligations of his assignor, and, as a general rule, to make any defence that might be interposed by the latter. The appellant was fully aware that the appellee was the person to whom he had to look for the payment of his judgment before he assigned it; and the fact that, in taking a re-assignment of it two months thereafter, he claimed to have procured from him a certificate of no defence, which he sought to use for his own protection, shows conclusively that he understood both the duty and importance of making inquiry, and arming himself with evidence that would estop the trustee from setting up any defence to the payment of the judgment. Having failed to prove the genuineness of the paper, he was left without any evidence of inquiry or proof of facts that would estop the trustee from interposing any defence he might have. Where inquiry becomes a duty, the party who neglects to perform it should be visited with at least constructive notice of the facts that probably would have been brought to light if it had been duly made. Applying this rule to the appellant, what would have been the result if before taking a re-assignment of the judgment he had gone to the trustee, Lewis Davis, and inquired of him whether he had any set-off or defence to its payment? In view of the facts found by the auditor it is reasonable to conclude he would have been informed that, in the early part of April preceding he had furnished money to his son, Rees Davis, to take up the claim, and that the latter had done so; that he had recently given the note to Rees for the purpose of presenting the claim before the auditor, and obtaining a credit or dividend to which, as trustee, he was entitled, and that Rees had no authority whatever to otherwise dispose of the claim thus intrusted to him. This would have terminated the negotiation with Rees Davis, and averted the unpleasant controversy that has ensued. As between Rees Davis and his father, it is very clear that the former never had any right to the judgment or its proceeds. He was furnished with money for the express purpose of taking up the claim, not for his own benefit but for his father, and it was of little consequence whether it was done in the form of a purchase or by actual payment. If the proper inquiry had been made by appellant he undoubtedly would have obtained information on which he could have acted with safety to himself and others. Having neglected to do so he is responsible for the consequences. But it is strenuously contended that, having but a short time before sold and transferred the judgment to Rees Davis, and finding the papers in his possession, in the same condition they were when delivered, there was no necessity for further inquiry. This position is clearly untenable. There was nothing in the relations between Rees Davis and his father, or anything else in the case to relieve the appellant from

the duty of making the usual inquiry; and the fact already adverted to, that he claimed to have procured a certificate of no defence shows that he not only recognised the duty, but fully appreciated its importance.

We are satisfied that the conclusion reached by the court was correct, and the appeal should be dismissed.

> Decree affirmed, and appeal dismissed at the cost of the appellant.